J-A14010-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| GRIFFIN T. CAMPBELL | : | |
| | : | |
| Appellant | : | No. 1810 EDA 2016 |

Appeal from the Judgment of Sentence January 8, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0001793-2014

BEFORE: GANTMAN, P.J., SHOGAN, J., and PLATT*, J.

MEMORANDUM BY GANTMAN, P.J.: **FILED SEPTEMBER 05, 2018**

Appellant, Griffin T. Campbell, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his jury trial convictions for thirteen counts of recklessly endangering another person, six counts of involuntary manslaughter, and one count each of aggravated assault and causing a catastrophe.[1] We affirm.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case. Therefore, we have no reason to restate them.

Appellant raises the following issues for our review:

> DID THE DELIBERATE FAILURE OF THE DISTRICT ATTORNEY TO PRESERVE AND PREPARE A DETAILED INVENTORY OF ALL OF THE PERSONAL, BUSINESS, AND

---

[1] 18 Pa.C.S.A. §§ 2705; 2504; 2702; and 3302, respectively.

---

\* Retired Senior Judge assigned to the Superior Court.

RELATED MARKET STREET WEST DEMOLITION AND DEVELOPMENT DOCUMENTS OF THE IMMUNITY WITNESS—ARCHITECT PLATO MARINAKOS, AND PROVIDE THAT DETAILED LIST AND ALL NAMED RECORDS, AND E-DATA TO THE CRIMINAL DEFENSE COUNSEL FOR APPELLANT—CONSTITUTE A VIOLATION OF THE **BRADY**[2] RULE AND DENY APPELLANT MATERIAL EXCULPATORY EVIDENCE AND IMPEACHMENT EVIDENCE AGAINST THE KEY COMMONWEALTH WITNESS?

DID THE DENIAL OF THE TRIAL COURT TO PERMIT DEFENSE COUNSEL TO CALL WITNESSES UNDER SUBPOENA AND AVAILABLE TO TESTIFY DENY APPELLANT A FAIR AND IMPARTIAL TRIAL?

DID THE [TRIAL] COURT COMMIT REVERSIBLE ERROR BY ITS RESTRICTIONS ON APPELLANT'S EXPERT WITNESS TESTIMONY OF CLIFTON FORDHAM, REGISTERED ARCHITECT?

WAS THE 15 TO 30 YEAR STATE CORRECTIONAL SENTENCE IMPOSED BY THE [TRIAL] COURT EXCESSIVE, PUNITIVE, AND IN CONTRADICTION TO THE JURY VERDICT OF INVOLUNTARY MANSLAUGHTER A MISDEMEANOR OF THE FIRST DEGREE?

DID BOTH THE SECRET TACIT AGREEMENT BETWEEN RICHARD BASCIANO AND THOMAS SIMMONDS AND THE OFFICE OF THE DISTRICT ATTORNEY NOT TO TESTIFY UNTIL AFTER THE CRIMINAL CONVICTION OF APPELLANT AND THE SUBSEQUENT CRIMINAL INDICTMENT AND CONVICTION OF THE FORMER DISTRICT ATTORNEY, SETH WILLIAMS, DENY APPELLANT A FAIR TRIAL?

WAS THE SUPERVISION OF THE MARKET STREET COLLAPSE CRIMINAL GRAND JURY INVESTIGATION BY FRANK FINA, ESQ.—AN ACTIVE PARTICIPANT IN THE "PORNGATE SCANDAL"—A VIOLATION OF APPELLANT'S CONSTITUTIONAL DUE [PROCESS] RIGHTS TO A FAIR AND RACE NEUTRAL PROSECUTION?

---

[2] **Brady v. Maryland**, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

(Appellant's Brief at 8-9).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Glenn B. Bronson, we conclude Appellant's first, second, third, fifth, and sixth issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of those issues. (*See* Trial Court Opinion, filed March 10, 2017, at 2-3; 10-17) (finding: (pp. 2-3) initially, Appellant's Rule 1925(b) statement consists of narrative of Appellant's complaints with several headings; format of concise statement does not comport with Pa.R.A.P. 1925(b)(4); to extent Appellant raises additional claims not addressed in court's opinion, those claims are waived for vagueness in concise statement; **(1)** (pp. 13-14) Appellant failed to identify in his post-sentence motions or concise statement those records of architect Plato Marinakos which Commonwealth allegedly failed to disclose and were favorable to Appellant; *Brady* does not obligate Commonwealth to secure evidence for Appellant but only to turn over exculpatory evidence in its possession; **(2)** (pp. 12-13) court did not categorically bar any witnesses who participated in investigations; rather, court set forth restrictions on introduction of hearsay evidence, absent applicable hearsay exception; Appellant could present evidence relevant only to criminal charges against him and his culpability, and results of investigations by properly qualified experts would be admitted only if they led to opinions relevant to Appellant's culpability; court excluded hearsay

testimony or evidence directed solely to culpability of people not on trial and irrelevant to charges against Appellant; court did not preclude Appellant from calling any witnesses on his list for whom he proffered relevant, admissible evidence; **(3)** (p. 15) record belies Appellant's claim; court ruled *in limine* that anything in Appellant's expert's report that pertained to architect Plato Marinakos' culpability was admissible and could be covered in full by Appellant's expert; court permitted defense to present freely any evidence of culpability of any witness testifying at trial because culpability of witness could arguably give rise to proper claim that witness was biased; because Commonwealth called Mr. Marinakos as witness, court did not bar Appellant's expert's opinion regarding Mr. Marinakos' culpability; **(5)** (pp. 16-17) Appellant offered no evidence to support his allegation of "tacit agreement"; at hearing to set briefing schedule for Appellant's post-sentence motions, both prosecuting attorneys in this case categorically denied any such agreement; defense counsel did not contend that prosecutors were being dishonest; instead, defense counsel relied solely upon fact that two witnesses asserted 5th Amendment right to remain silent at Appellant's trial but then testified in civil depositions after Appellant's trial; absent some offer of proof, Appellant failed to establish "act by government" caused loss of those witnesses' testimony at Appellant's trial; further, Appellant does not indicate how those witnesses would have provided material or favorable evidence to defense; **(6)** (pp. 10-12) Appellant failed to raise claim of selective prosecution in pre-trial

motion to dismiss, so this claim is waived; moreover, Appellant cannot show that anyone not prosecuted was similarly situated to Appellant; other Caucasian men involved in demolition project did not share Appellant's responsibilities as sole demolition contractor to supervise and direct day-to-day operations of demolition worksite; prosecutor's decision not to pursue charges against those individuals is not basis for valid selective prosecution claim; notwithstanding former ADA Fina's supervision of grand jury proceedings and involvement in exchange of racially offensive e-mails, Appellant does not dispute that former ADA Fina's role was limited to grand jury investigation or that former District Attorney Seth Williams made ultimate charging decisions in this case; Appellant has not alleged racial bias by Seth Williams; even if Appellant's averments of racial hostility regarding former ADA Fina were correct, they would not have supported Appellant's selective-prosecution claim or entitled him to relief). Therefore, as to Appellant's first, second, third, fifth, and sixth issues, we affirm on the basis of the trial court's opinion.

In his fourth issue, Appellant argues the sentence the court imposed is more consistent with one for a third-degree murder conviction than one for involuntary manslaughter. Appellant claims the court ignored his prior record score of one, which was not for a violent crime, and the jury's acquittal on the third-degree murder charges. Appellant insists the sentence of 15 to 30 years was excessive and a *de facto* life sentence, given Appellant's age and life

expectancy. Appellant contends the trial court should also reconsider its sentence in light of the verdict in Appellant's civil trial, which took place after Appellant's criminal trial and sentencing, demonstrating Appellant was the least culpable civil defendant.[3] As presented, Appellant's claim implicates the discretionary aspects of sentencing. *See Commonwealth v. Archer*, 722 A.2d 203 (Pa.Super. 1998) (*en banc*) (holding claim that court misapplied sentencing guidelines implicates discretionary aspects of sentencing); *Commonwealth v. Berry*, 785 A.2d 994 (Pa.Super. 2001) (explaining allegation that court failed to consider specific mitigating factor implicates discretionary aspects of sentencing); *Commonwealth v. Cruz-Centeno*, 668 A.2d 536 (Pa.Super. 1995), *appeal denied*, 544 Pa. 653, 676 A.2d 1195 (1996) (stating claim that court imposed excessive and unreasonable sentence without considering mitigating factors challenges sentencing court's discretion).

Challenges to the discretionary aspects of sentencing do not entitle an

---

[3] Within his sentencing issue, Appellant also appears to contest the sufficiency of the evidence to sustain his aggravated assault conviction, claiming the Commonwealth failed to prove that crime beyond a reasonable doubt and in light of the jury's acquittal on the third-degree murder charges. Nevertheless, Appellant cites no law regarding the relevant standard and scope of review of sufficiency claims, the elements for aggravated assault, or inconsistent verdicts. Therefore, this precise claim is waived. *See Commonwealth v. Knox*, 50 A.3d 732 (Pa.Super. 2012), *appeal denied*, 620 Pa. 721, 69 A.3d 601 (2013) (reiterating failure to cite to legal authority to support argument results in waiver of claim on appeal). Further, the trial court thoroughly explained its rationale for rejecting this claim in its opinion. (*See* Trial Court Opinion at 17-23).

appellant to review as of right. ***Commonwealth v. Sierra***, 752 A.2d 910 (Pa.Super. 2000). Before we review a discretionary aspect of sentencing claim:

> [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

***Commonwealth v. Evans***, 901 A.2d 528, 533 (Pa.Super. 2006), *appeal denied*, 589 Pa. 727, 909 A.2d 303 (2006).

When appealing the discretionary aspects of a sentence, an appellant must invoke the appellate court's jurisdiction by including in his brief a separate concise statement demonstrating that there is a substantial question as to the appropriateness of the sentence under the Sentencing Code. ***Commonwealth v. Mouzon***, 571 Pa. 419, 812 A.2d 617 (2002); Pa.R.A.P. 2119(f). "The requirement that an appellant separately set forth the reasons relied upon for allowance of appeal furthers the purpose evident in the Sentencing Code as a whole of limiting any challenges to the trial court's evaluation of the multitude of factors impinging on the sentencing decision to **exceptional** cases." ***Commonwealth v. Williams***, 562 A.2d 1385, 1387 (Pa.Super. 1989) (*en banc*) (emphasis in original) (internal quotation marks omitted). Failure of the defendant to include the requisite Rule 2119(f)

- 7 -

statement constitutes waiver of a challenge to the discretionary aspects of a sentence if the Commonwealth objects to omission of the statement. **Commonwealth v. Bruce**, 916 A.2d 657 (Pa.Super. 2007), *appeal denied*, 593 Pa. 754, 932 A.2d 74 (2007).

Instantly, Appellant failed to include the requisite Rule 2119(f) statement in his appellate brief, and the Commonwealth objected to this omission. Consequently, Appellant's challenge to the discretionary aspects of his sentence is waived.[4] **See** Pa.R.A.P. 2119(f); **Bruce, supra**. Accordingly, we affirm Appellant's other issues on the basis of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/5/18

---

[4] Further, the trial court thoroughly explained its sentencing rationale in its opinion. (**See** Trial Court Opinion at 23-25).

- 8 -

**Received**

MAR 10 2017

Office of Judicial Records
Appeals/Post Trial

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA

       v.

GRIFFIN CAMPBELL

:     CP-51-CR-0001793-2014

*1810 EDA 2016*

CP-51-CR-0001793-2014 Comm. v. Campbell, Griffin T.
Opinion



7917725061

OPINION

BRONSON, J.                               March 10, 2017

On October 19, 2015, following a jury trial before this Court, defendant Griffin Campbell was convicted of one count of causing a catastrophe (18 Pa.C.S. § 3302), six counts of involuntary manslaughter (18 Pa.C.S. § 2504), thirteen counts of recklessly endangering another person ("REAP") (18 Pa.C.S. § 2705), and one count of aggravated assault (18 Pa.C.S. § 2702).[1] On January 8, 2016, the Court imposed an aggregate sentence of fifteen to thirty years incarceration in state prison. Defendant filed post-sentence motions, which the Court denied on May 13, 2016.

On January 26, 2017, in response to an order of the Court, defendant filed a Concise Statement of Errors Complained of on Appeal ("Statement of Errors") pursuant to Pa.R.A.P. 1925(b). The Statement of Errors begins with eight numbered paragraphs that state defendant's intention to file motions based upon newly discovered evidence. Under the Rules of Criminal Procedure, "[a] post-sentence motion for a new trial on the ground of after-discovered evidence must be filed promptly after such discovery." Pa.R.Crim.P. 720(C). Moreover, "after-discovered evidence discovered during the direct appeal process must be raised promptly during the direct

---

[1] Defendant was found not guilty of one count of conspiracy to cause a catastrophe (18 Pa.C.S. § 903), and six counts of third degree murder (18 Pa.C.S. § 2502).

appeal process, and should include a request for a remand to the trial judge." Pa.R.Crim.P. 720 comment. As of the date of this Opinion, defendant has not filed a motion based on after-discovered evidence, and has not sought a remand from the Superior Court for a hearing. Accordingly, the averments in the Statement of Errors regarding newly discovered evidence are not addressed further in this Opinion.[2]

The remaining paragraphs of the Statement of Errors, which are not numbered, consist of a narrative of defendant's complaints with several headings. While the Court believes that this format does not comport with the mandates of Pa.R.A.P. 1925(b), the Court has attempted to glean defendant's claims from this pleading.[3] Having done so, the Court believes that defendant is claiming the following errors on appeal: 1) the Court erred in failing to dismiss the jury panel as the panel was tainted by pre-trial publicity; 2) the Court erred in ruling that privately retained counsel was required to pay for grand jury notes of testimony; 3) the Court erred in denying defendant's motion to dismiss due to selective racial prosecution; 4) the Court failed to investigate racial hostility by Frank Fina, the assistant district attorney who supervised the grand jury investigation; 5) the Court erred in prohibiting defendant from presenting numerous witnesses, including officials who could testify to fact finding investigations of the collapse, such as the Mayor, City Controller, and Inspector General of the City of Philadelphia; 6) the Commonwealth failed in its affirmative duty to secure and produce all records of Plato Marinakos, the architect working for the owner of the collapsed property, who had been immunized by the Commonwealth; 7) the Commonwealth wrongfully withheld discovery from

---

[2] Defendant did file, on March 2, 2017, a document entitled "Petition of Grffin [sic] Campbell to the Post Conviction Relief Unit of the Office of the District Attorney...." Although filed with the Clerk of this Court, this petition sought relief only from the District Attorney, requesting that District Attorney Seth Williams take action on this case prior to the expiration of his term in office. Petition at ¶ 28.

[3] The Rule requires that the claims on appeal be set forth in a concise and non-redundant manner. Pa.R.A.P. 1925(b)(4).

2

defendant regarding the fact finding investigations of various officials, and the Court erred in failing to conduct an investigation into this matter; 8) the Court erred in restricting the testimony of Clifton Fordham, an architect retained as an expert by the defense; 9) the Court failed to investigate a secret, tacit agreement between the Commonwealth and witnesses Richard Basciano (owner of the collapsed property) and Thomas Simmonds (property manager for Basciano), pursuant to which these witnesses asserted the Fifth Amendment and refused to testify at defendant's trial, but immediately thereafter testified freely in civil dispositions regarding the collapse; 10) the jury's verdict for aggravated assault regarding victim Mariya Plekan was not supported by sufficient evidence, and was inconsistent with the jury's other verdicts; 11) the Court's sentence was excessive; and 12) the Court erred in denying all of defendant's motions and objections noted on the record at all pre-trial hearings, motions, trial, and post-trial motions.[4] Concise Statement of Errors Complained of on Appeal ("Statement of Errors") at unnumbered pages 2-7. For the reasons set forth below, defendant's claims are without merit and the judgment of sentence should be affirmed.

## I. FACTUAL BACKGROUND

At trial, the Commonwealth presented the testimony of Philadelphia Police Detective Paul Guercio, Philadelphia Police Officers John Taggert and Robert Flade, FBI Agent William Schute, Philadelphia Fire Department Chief John O'Neill, Delaware State Chief Medical Examiner Dr. Gary Collins, Philadelphia Deputy Chief Medical Examiner Dr. Albert Chu, Plato Marinakos, Timothy Lotspeich, Darryl Alston, Eric Sullivan, Nadine White, Rodney Geddis, Felicia Hill, Albert McCarthy, John Higgins, Richard Roberts, Sarah Carle, Mariya Plekan,

---

[4] Defendant's claims have been reorganized and, in some cases, combined for ease of analysis. To the extent that defendant seeks to raise claims in addition to those set forth above, they are waived for vagueness. *See Commonwealth v. Cannon*, 954 A.2d 1222, 1228 (Pa. Super. 2008) (where a defendant makes a vague and generalized objection on appeal that leaves the trial court to guess at his claims, those claims are deemed to have been waived).

3

Rosemary Kreutzberg, Sean Benschop, Tynisha Gregory-Benschop, David Peraza, Kadiatu Conteh, Robert Coleman, Maggie Davis, Nancy Winkler, Margarita Agosto, Ralph Pomponi, and Nicholas DeJesse. Defendant testified on his own behalf and presented the testimony of Philadelphia Police Officer Gary Harrison, Clifton Fordham, John Doherty, Scott Mulderig, Perry Cocco, Frank Parker, Esther Jones-Woodrit, Elizabeth Minter, and Michelle Holden. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

Richard Basciano was the owner of a group of properties located on the 2100 and 2200 blocks of Market Street in Philadelphia. In 2011, Basciano, and his property holding company STB, hired architect Plato Marinakos to assist in the development of that area. N.T. 10/1/15 (Vol. 1) at 19-23. Around September of 2012, Basciano enlisted the aid of Marinakos to accomplish the demolition of several buildings as part of the development project. N.T. 10/1/15 (Vol. 1) at 25-28.

In order to find a demolition contractor, Marinakos solicited bids from four companies that he had worked with before, including defendant's company. N.T. 10/1/15 (Vol. 1) at 28-30, 33-34. Defendant was, by far, the lowest bidder, and was hired. N.T. 10/1/15 (Vol. 1) at 40-49. In May 2013, defendant began demolition of the buildings on the 2100 block, including the building located at 2136 Market Street, which formerly housed a Hoagie City restaurant ("the Hoagie City building"). N.T. 10/1/15 (Vol. 1) at 91-97. The Hoagie City building was a four-story structure that shared a wall with the Salvation Army Thrift Store immediately to its west (the shared "western wall"). The Salvation Army Thrift Store was not owned by Basciano and was still an ongoing business. N.T. 10/1/15 (Vol. 1) at 19-20; 10/6/15 at 161-162, 176, 186-187.

4

As the demolition contractor, defendant was in control of the means and methods of demolition. N.T. 10/1/15 (Vol. 1) at 57-59; 10/2/15 at 49; 10/5/15 at 193; 10/6/15 at 67; 10/7/15 at 72, 79; 10/8/15 at 56, 103; 10/9/15 at 20. Defendant was also in charge of on-site safety. N.T. 10/1/15 (Vol. 1) at 62.

As defendant worked to demolish the Hoagie City building, defendant ordered the removal of the horizontal floor joists, which defendant then resold for salvage, leaving the building without lateral support. N.T. 10/1/15 (Vol. 1) at 96, 98-100, 107; 10/5/15 at 193; 10/6/15 at 16-18, 27-28; 10/7/15 at 194-196, 199-200. By removing the joists, defendant also removed the ability for workers to take the building down by hand, as the internal floors were now left without support. N.T. 10/5/15 at 183; 10/6/15 at 25; 10/8/15 at 59; 10/9/15 at 36. Defendant was told multiple times that removing the joists was rendering the building unsafe. N.T. 10/6/15 at 30-32, 39-40.[5]

In an attempt to continue demolition without using the internal floors, defendant sought permission from the Salvation Army to continue the demolition work from the Salvation Army building roof, but this permission was denied. N.T. 10/15/15 at 256-258, 274-275. Without access to the Salvation Army roof, defendant informed Marinakos that he would have to tear the building down from the inside, and so the demolition would be harder. N.T. 10/2/15 at 17. Defendant could have rented a "high reach" to effectuate the demolition, but chose not to due to costs.[6] N.T. 10/2/15 at 21-25; 10/6/15 at 34, 36-37; 10/8/15 at 62-65.

Defendant hired co-defendant Sean Benschop in April to assist with the demolition. N.T. 10/2/15 at 49; 10/8/15 at 51-55. Benschop owned an excavator used in the demolition. N.T.

---

[5] Buildings adjacent to occupied structures require top-down, floor by floor, hand demolition. N.T. 10/7/15 at 24-25; 10/7/15 at 184-188, 201-202, 221, 260; 10/9/15 at 32-35.

[6] A high reach is a mechanically lifted platform that enables construction workers to reach otherwise inaccessible locations in order to complete their tasks.

5

10/8/15 at 45, 51-53, 208. While the Hoagie City building was being demolished, and after it had been gutted, Benschop told Campbell that defendant would need a high reach in order to knock down the building's western wall. N.T. 10/8/15 at 57-58, 61-62.

On June 2, 2013, defendant ordered Benschop to demolish the front wall of the Hoagie City building with his excavator, removing one of the two walls supporting the western wall and leaving the western wall almost completely free standing. N.T. 10/5/15 at 250; 10/6/15 at 73; 10/8/15 at 68-69. On that day, Benschop voiced concerns about the western wall, and defendant indicated that he would take care of it. N.T. 10/5/15 at 220-221. On June 3, 2013, no demolition work was done due to rainy weather. N.T. 10/1/15 (Vol. 1) at 113; 10/2/15 at 47.

Demolition work on the western wall continued on June 4, 2013, and included the partial removal of the eastern wall by Benschop and the excavator. N.T. 10/8/15 at 75-77. Although Benschop told defendant that it was dangerous to use the excavator at that time, defendant directed Benschop to continue to use it. N.T. 10/8/15 at 75-78. That day, Marinakos visited the site to take pictures and, seeing the freestanding western wall, told defendant, "You have to take this wall down immediately." N.T. 10/1/15 (Vol. 1) at 113-119; 10/2/15 at 26-29. Defendant told Marinakos that defendant would take care of it, and that he had men coming that night to get up on the Salvation Army roof to lower the wall. N.T. 10/2/15 at 28; 10/8/15 at 78, 80.

That night, defendant had several workers go up on the Salvation Army roof work on removing parts of the wall. N.T. 10/6/15 at 75-80. These workers also informed defendant that the wall was unsecure. N.T. 10/6/15 at 81-82. They were not able to significantly lower the unsupported portions of the wall. N.T. 10/8/15 at 81. At this time, the wall was in an imminent state of collapse and a gust of wind could have knocked it down. N.T. 10/9/15 at 46, 50.

6

On the morning of June 5, 2013, demolition work at the site continued. N.T. 10/5/15 at 223-226. Although the unsupported wall loomed over the Salvation Army building, the thrift store remained open for business. N.T. 10/6/15 at 161-162, 176, 186-187. Defendant called Marinakos and falsely stated that the wall had been taken down. N.T. 10/2/15 at 36-37.

That same morning, defendant ordered Benschop to work on demolishing the eastern wall with a pry tool in the jaws of the excavator. N.T. 10/1/15 (Vol. 2) at 37; 10/7/15 at 35; 10/8/15 at 82-83. Benschop began working on the eastern wall as directed and, at approximately 10:41 a.m., the western wall collapsed and fell onto the Salvation Army building, collapsing the roof into the store. N.T. 10/2/15 at 37-38; 10/5/15 at 226-231; 10/8/15 at 86-87. Immediately after the collapse, defendant called Marinakos and told him to come to the scene. N.T. 10/2/15 at 37-38. Defendant also told Marinakos that the excavator was being used, that it hit the western wall, and that the western wall had collapsed. N.T. 10/2/15 at 39-40.

Rescue workers and emergency personnel arrived and attempted to search the construction pile for survivors. N.T. 10/1/15 (Vol. 2) at 19; 10/7/15 at 145-160. The rescue operation continued throughout the day and into the next morning. N.T. 10/1/15 (Vol. 2) at 20; 10/7/15 at 145-160. Defendant later called Marinakos and apologized for the collapse. N.T. 10/2/15 at 45. Benschop, who was injured in the collapse, was transported to the hospital by another co-worker. N.T. 10/5/15 at 223-224, 243; 10/8/15 at 88-89.

As a result of the collapse, Kimberly Finnegan, Juanita Harmon, Roseline Conteh, Borbor Davis, Ann Bryan, and Mary Simpson were killed. N.T. 10/1/15 (Vol. 2) at 21-23, 75-78, 81-84, 94-101. The collapse seriously injured Mariya Plekan, resulting in a year-long hospital stay, multiple surgeries, and the amputation of both her legs. N.T. 10/1/15 (Vol. 2) at 23; 10/8/15 at 24-32. Rosemary Kreutzberg was trapped in the rubble, resulting in three days of

7

hospitalization. N.T. 10/8/15 at 35-39. The collapse also placed numerous other people at risk as they were on or near the site at the time of the collapse. N.T. 10/6/15 at 166-168, 177-181, 187-192. Emergency medical personnel also assisted pedestrians who were off to the side of the street at the time of the collapse. N.T. 10/1/15 (Vol. 2) at 15-16, 25-26, 28-30.

Following the collapse, defendant informed Marinakos that the excavator was being used in the demolition just prior to the collapse. N.T. 10/2/15 at 39-40. However, in defendant's initial interview with OSHA investigator Sarah Carle, defendant denied that the excavator was in use at the time of the collapse. N.T. 10/7/15 at 286-287. Defendant did ultimately admit to Carle that the excavator was running and was being used in demolition at the time. N.T. 10/7/15 at 287.

## II. DISCUSSION

### A. Jury Tainted by Pretrial Publicity

Defendant asserts that the Court "should have dismissed the entire [jury] panel" as the unfavorable media attention generated by this case polluted the jury pool and rendered the panel unable to render a neutral, fair, and unbiased verdict. Statement of Errors at unnumbered pages 2-3. However, defendant did not, at any time prior to trial or during jury selection, make a claim that the jury pool was tainted and that the jury panel should be dismissed. Accordingly, this claim is waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *Commonwealth v. Miller*, 80 A.3d 806, 811 (Pa. Super. 2013).

### B. Requirement to Pay for Grand Jury Notes of Testimony

Defendant next claims that, prior to the commencement of trial, defense counsel requested a copy of the notes of testimony from the grand jury proceedings in this matter, and

8

that the Court erred in requiring that defendant pay for the notes in order to receive them. Statement of Errors at unnumbered pages 3-4. This claim should be rejected for two reasons.

First, at no time did defendant request that he be provided with the notes free of charge. While the Court did state that only court-appointed counsel was entitled to notes of testimony without paying for them, defendant's privately retained counsel never argued that he was entitled to have the government pay for the notes due to defendant's inability to afford them. To the contrary, counsel advised the Court that because key grand jury witnesses had given extensive depositions in the civil suit arising out of the collapse, and since counsel had the transcripts of all of those depositions, and the exhibits from those depositions, he believed that he had sufficient material for an effective defense without the grand jury transcripts. N.T. 9/21/2015 at 34-36. Defendant cannot properly claim that the Court erred in denying a request that was never made. *See Miller*, 80 A.3d at 811.

Second, the record establishes that any claim premised upon defendant's lack of access to the notes was explicitly waived. The Court held an extensive *ex parte* colloquy with defendant and defense counsel prior to trial to address trial counsel's election to forego ordering some of the grand jury notes. N.T. 9/21/15 at 27-38. During this colloquy, defense counsel described in detail his reasons for going forward without ordering the notes, including, as stated above, counsel's access to the extensive discovery from the related civil case. N.T. 9/21/2015 at 34-36. The Court then advised defendant that if he was not satisfied to proceed without the notes, the Court would permit defendant to present a claim that he could not afford his defense, that he was entitled to court-appointed counsel and all of the notes free of charge, and that the case should be continued. N.T. 9/21/2015 at 37. Defendant declined that invitation and elected to proceed to trial, leading the Court to find that defendant had made "a knowing, intelligent, and voluntary

9

relinquishment of his right to have court-appointed counsel and the documents paid for by the Commonwealth." N.T. 9/21/2015 at 37. Neither defendant nor his counsel contested that finding. N.T. 9/21/2015 at 37-38.

Accordingly, the record demonstrates that defendant and his privately retained counsel made a joint strategic decision to proceed to trial without some of the grand jury notes, and that defendant waived any claim based his failure to secure those notes. No relief is due.

### C. Motion to Dismiss due to Selective Racial Prosecution

Defendant claims that he was denied his constitutional rights due to selective prosecution. He premises this claim on the fact that he and co-defendant Benschop, both of whom are African-American, were the only people to be criminally prosecuted for the collapse, while numerous other culpable parties, all of whom were Caucasian, were not prosecuted. Statement of Errors at unnumbered page 3.

It is well-established that a claim of selective prosecution is waived if it is not raised in a pre-trial motion to dismiss. *Commonwealth v. Butler*, 601 A2d 268, 270-71 (Pa. 1991). Defendant first raised his claim of selective prosecution in a post-verdict motion for extraordinary relief. Accordingly, this claim is waived. *Id.*

Even if defendant had properly preserved his claim, he would still not be entitled to relief. To establish a defense of selective prosecution, the defendant must prove that: 1) other similarly situated individuals were not prosecuted for similar conduct; and 2) that the decision to prosecute the defendant was based on an impermissible ground such as race, religion, the exercise of some constitutional right, or any other arbitrary classification. *Commonwealth v. Olavage*, 894 A.2d 808, 811 (Pa. Super. 2006) (citing *Commonwealth v. Mulholland*, 702 A.2d 1027 (Pa. 1997). Defendant must establish that he was prosecuted for an invalid reason, not that

10

another guilty party was not prosecuted. *Commonwealth v. Childress*, 799 A.2d 805, 811 (Pa. Super. 2002).

Here, defendant cannot demonstrate that anyone who was not prosecuted was similarly situated to the defendant. The defendant averred that the following white males shared culpability for the collapse: "Plato Marinakos – Project Achitect, Richard Basciano – Owner, Thomas Simmonds Property Manager, Frank Cresci – Comptroller of STB, Alexander Wolfington – Exclusive Real Estate Broker for the Project." Defendant's Post Verdict Motion Pursuant to Pennsylvania Rules of Criminal Procedure 704(b) for Extraordinary Relief – Selective Racial Prosecution During the Investigating Grand Jury Investigation and Indictment Process and the Tacit Agreement Not to Indict Richard Basciano, Thomas Simmonds and Frank Cresci at ¶ 7. None of these men shared defendant's responsibility, as the sole demolition contractor, to supervise and direct the day-to-day operation of the demolition worksite. Where, as here, the persons not charged had a distinct and different role in the events at issue, the prosecutor's decision not to pursue charges against those persons cannot be the basis for a valid selective prosecution claim. *Olavage*, 894 A.2d at 811.

Accordingly, defendant's selective prosecution claim is both waived and without merit. No relief is due.

### D. *Failure to Investigate Racial Hostility by Frank Fina*

Defendant further asserts that the Court erred by dismissing, without judicial investigation, defendant's post-trial motion alleging racial hostility by Assistant District Attorney Frank Fina, who led the grand jury investigation into the collapse. Statement of Errors at unnumbered page 7. This claim is without merit.

11

It is true that Assistant District Attorney Fina supervised the investigating grand jury that recommended charges against defendant. It is also true that Fina was allegedly involved in the exchange of racially offensive emails. However, the Commonwealth averred, and defendant did not dispute, that Fina's role was limited to his involvement in the grand jury investigation. It is undisputed that Seth Williams, the District Attorney, made the charging decisions in this case. Defendant has not, at any time, alleged racial bias on the part of Mr. Williams.

Accordingly, assuming *arguendo* that defendant's averments regarding Fina were correct, they would not have supported defendant's selective prosecution claim, nor otherwise have entitled defendant to relief. Therefore, the Court properly denied defendant's request to conduct a "judicial investigation" into the email exchanges involving Fina.

*E. Prohibiting Defendant from Calling Witnesses at Trial*

Defendant alleges that several investigations of the collapse were conducted by a variety of officials, including the Mayor, the City Controller, the City Inspector General, and others. He contends that the Court erred in barring him from calling witnesses to present the findings of these investigations. Statement of Errors at unnumbered pages 4-5.

Defendant's claim incorrectly describes the ruling of the Court. After receiving defendant's witness list, the Commonwealth moved *in limine* to exclude numerous public officials that were included on that list who may have had involvement in an investigation of the collapse. The Court did not categorically bar any witnesses who participated in the investigations. Instead, it set forth the following restrictions.

First, the Court stated defendant would not be permitted to put on evidence unless it complied with the rules of evidence. Therefore, hearsay would not be admissible absent an applicable exception to the hearsay rule. N.T. 7/24/2015 at 41-54. For example, the Mayor

12

would not be permitted to be called as a witness to testify to the things that his staff had reported to him about the collapse, and which he may have commented on in a press conference. That would be hearsay. N.T. 7/24/2015 at 39-41.

Second, the Court would only permit evidence relevant to the criminal charges against the defendant. Evidence of the culpability of other people and organizations would only be admitted if relevant to defendant's own culpability. Therefore, any evidence of the culpability of any witnesses called at trial would be admitted, since the arguable culpability of a witness could give rise to a proper claim that the witness was biased. N.T. 7/24/2015 at 44. Also, evidence that anyone had interactions with the defendant in a manner that might affect his mental state would be allowed, such as what an L&I inspector or OSHA inspector may have done, or failed to have done, after coming to the site and meeting with defendant. All such evidence would be admissible. N.T. 7/24/2015 at 54.

Third, the results of investigations by properly qualified experts would be admitted if they led to opinions relevant to defendant's culpability in this case. Also, any regulations that were in effect, or any policies and practices that may have been known by defendant would be admitted as well. N.T. 7/24/2015 at 41-42. All that was excluded was hearsay or evidence directed solely to the culpability of people and organizations not on trial that did not have relevance to the criminal charges against defendant. N.T. 7/24/2015 at 54-56.

The Court did not preclude defendant from calling any witnesses on his list for whom he proffered relevant, admissible evidence. Accordingly, no relief is due.

*F. Failure to Secure and Produce Records of Plato Marinakos*

Defendant asserts that the Commonwealth failed in its "clear affirmative duty to secure and produce all of [Marinakos'] records, documents, emails and all discovery relating to the

13

Market Street Collapse" once Marinakos was granted immunity, and that the Court failed to correct this error. Statement of Errors at unnumbered page 5. In his post-sentence motions, defendant argued that the failure of the Commonwealth to produce this material was a violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963). This claim is without merit.

Under *Brady,* exculpatory evidence not disclosed to the defense will give rise to a due process violation and will require a new trial if the exculpatory evidence is "material" either to guilt or punishment. 373 U.S. at 87; *see also* Pa.R.Crim.P. 573(B)(1)(a) (specifying, as mandatory discovery, "[a]ny evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth"). Defendant must therefore establish three elements: "(1) suppression by the prosecution (2) of evidence, whether exculpatory or impeaching, favorable to the defendant, (3) to the prejudice of defendant." *Commonwealth v. Tedford,* 960 A.2d 1, 30 (Pa. 2008). If the police possess evidence that is favorable to the defense, then the Commonwealth is deemed to be responsible for its disclosure even if it is solely in the possession of the police. *See Commonwealth v. Lambert*, 884 A.2d 848, 853 (Pa. 2005) (quoting *Brady*, 373 U.S. at 87).

Nowhere in defendant's Statement of Errors, or post-sentence motions, does defendant identify the records of Marinakos that were not disclosed and that were favorable to defendant. *See* Defendant's Post-Sentencing Appeal and Motions per Rule 720, filed January 19, 2016, unnumbered page 3 at ¶ 2; Statement of Errors at unnumbered page 5. Moreover, unless material is in possession of the police, *Brady* does not obligate the Commonwealth to secure evidence for defendant, but only to turn over exculpatory evidence in its possession. Since the Commonwealth was under no obligation to secure any records of Marinakos, no relief is due.

14

*G. Withholding Discovery and Failure of Court to Investigate*

Defendant claims that the Commonwealth wrongfully withheld discovery regarding the results of fact-finding investigations of the collapse that were performed by "Investigation Members," including the Mayor, the City Controller, the City Inspector General, and others. Statement of Errors at unnumbered page 5. However, defendant did not, at any time prior to this appeal, make this claim, nor seek relief from the Court concerning these alleged discovery violations. Accordingly, this claim is waived. See Pa.R.A.P. 302(a); *Miller*, 80 A.3d at 811.

*H. Restricting the Testimony of Defense Expert Clifton Fordham*

Defendant asserts that the Court committed error by "severely restrict[ing] the Defendant[']s Expert Report and Trial Testimony of Board Certified Architect, Clifton Fordham." Statement of Errors at unnumbered page 5. As the basis for this claim, defendant avers that Fordham placed primary responsibility for the safe demolition of the property on architect Plato Marinakos, and that the Court denied defendant a fair trial by not permitting Fordham to cover Marinakos' responsibility for the collapse in his testimony. *Id.*

This claim is refuted by the record. Contrary to defendant's averments in the Statement of Errors, the Court ruled *in limine* that anything in Fordham's report that pertained to Marinakos' culpability was admissible and could be covered in full by Fordham. N.T. 7/24/15 at 44-48. As detailed in Section II.(E) above, the Court permitted the defense to freely present any evidence of the culpability of any witnesses called at trial since the arguable culpability of a witness could give rise to a proper claim that the witness was biased. Because Marinakos was a Commonwealth witness, Fordham's opinion regarding Marinakos' culpability was not barred from evidence. No relief is due.

15

*I. Failure to Investigate Tacit Agreement*

Defendant asserts that the Court erred in denying his post-trial motions "concerning the secret tacit agreement between the DA and the counsel for both witnesses." Statement of Errors at unnumbered page 6. In his post-trial motions, defendant asserted that witnesses Richard Basciano and Thomas Simmonds both asserted their right to remain silent under the Fifth Amendment and refused to testify at defendant's trial, and yet testified in civil depositions about the collapse after defendant's criminal trial was completed.[7] Defendant averred that he was denied the right to present the testimony of these witnesses due to a "tacit agreement" between these witnesses and the District Attorney that they would not be prosecuted so long as they refused to testify in the criminal case. Post Sentencing Appeal and Motions per Rule 720, unnumbered page 3 at ¶ 5; Defendant's Rule 720 Pennsylvania Rules of Criminal Procedure – Post Sentencing Motion [Based on] Selective Racial Prosecution During the Investigating Grand Jury Investigation and Indictment Process and the Tacit Agreement Not to Indict Richard Basciano, Thomas Simmonds and Frank Cresci at ¶ 12. This claim is without merit.

"To establish a fourteenth amendment due process violation based on the denial of the right to compulsory process, a defendant must establish more than the mere absence of testimony. There must be a plausible showing that an act by the government caused the loss or erosion of testimony that was both material and favorable to the defense." *Commonwealth v. Holloman*, 621 A.2d 1046, 1054 (Pa. Super. 1993) (internal citations omitted). As such, defendant must establish "some plausible nexus between the challenged governmental conduct and the absence of certain testimony." *Id.* (quoting *United States v.* Hoffman, 832 F. 2d 1299, 1303 (1st. Cir. 1987).

---

[7] In post sentence motions, defendant also claimed that Frank Cresci was a party to the secret agreement. Cresci was not mentioned in the Statement of Errors.

16

Here, defendant never proffered any evidence to support his allegation of a secret agreement. At a hearing on the post-sentence motions, both prosecuting attorneys in this case, Edward Cameron and Jennifer Selber, categorically denied any such agreement. N.T. 1/29/16 at 19-20, 23. Defense counsel did not contend that the prosecutors were being untruthful. N.T. 1/29/16 at 23.[8] Instead, he relied solely upon the fact that both witnesses initially asserted, and then later withdrew, their Fifth Amendment privilege not to testify. Absent some offer of proof, defendant failed to establish that an "act by the government caused the loss" of this testimony. *Holloman*, 621 A.2d at 1054.

In addition, defendant failed to set forth any analysis or argument as to how these two witnesses, if they had not asserted their Fifth Amendment right to not testify, would have provided evidence both material and favorable to the defense. While defendant's post-sentencing motions included as exhibits over two thousand pages of civil depositions, transcripts, and documents, defendant did not cite to anything that would have permitted this Court to examine how these witnesses might have assisted defendant if they had testified.

Accordingly, no relief is due.

*J. Insufficient Evidence and Inconsistent Verdict for Aggravated Assault*

Defendant was convicted of one count of aggravated assault regarding victim Mariya Plekan. Defendant asserts that this conviction "should be dismissed due to both lack of essential elements of proof and the inconsistent jury verdict." Statement of Errors at unnumbered page 6. Defendant further avers that "during [Plekan's] trial testimony the DA never met the burden to prove all the elements to the F1 Aggravated Assault." *Id.*

---

[8] When the Court inquired as to whether defense counsel was challenging the veracity of the prosecutors, defense counsel stated: "I'm not challenging the integrity of these two fine prosecutors." N.T. 1/29/2016 at 23.

17

As to defendant's inconsistent verdict claim, defendant fails to specify in his Statement of Errors how the verdict was inconsistent. However, in his post-sentence motions, defendant premised his argument on the fact that the *mens rea* for third degree murder and for first degree aggravated assault are the same: each requires that the defendant act at least recklessly in a manner that manifests extreme indifference to value of human life. Defendant claimed that since he was acquitted of all of the third degree murder charges, the jury necessarily found that he lacked the required *mens rea* for both third degree murder and first degree aggravated assault. As a result, defendant asked for a judgment of acquittal on the aggravated assault charge. Defendant[']s Post Verdict Motion Pursuant to Pennsylvania Rule of Criminal Procedure 606(5) [*sic*] – Motion for Judgment of Acquittal of the Conviction for Aggravated Assault – Victim Mariya Plekan – Rendered on October 19, 2015 at ¶¶ 4-16.

This argument is refuted by established law. Inconsistent verdicts are not a ground for setting aside a conviction so long as the evidence is sufficient to support the convictions. As a result, an acquittal on a third degree murder charge will not undermine a conviction for first degree aggravated assault. *Commonwealth v. Frisbie*, 889 A.2d 1271, 1274 (Pa. Super. 2005). In *Frisbie*, the defendant beat the victim to death after a fight in a restaurant bathroom. The jury found defendant guilty of aggravated assault and involuntary manslaughter, but not guilty of third degree murder. Just as in the case at bar, the defendant argued that the verdict on the third degree murder charge required a judgment of acquittal on the aggravated assault charge, since it negated the *mens rea* required for aggravated assault. The Superior Court rejected that argument, applying the principle that inconsistent verdicts are not a ground for relief. 889 A.2d at 1272-1273. As the Court then stated, "acquittal on the third degree murder charge is not a

18

specific finding that appellant did not act with malice." 889 A.2d at 1274. This rule applies with equal force here.

Moreover, there was ample evidence in this case for the jury to conclude that defendant acted with the requisite "reckless[ness] under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S. § 2702(a)(1). First, the evidence clearly established that defendant was the sole demolition contractor and was in charge of the means and methods of demolition that led to the disaster. Architect and owner representative Plato Marinakos testified that defendant bid on the Market Street project with the understanding that he would be able to salvage and sell materials from the demolition. N.T. 10/1/15 at 43-47. Marinakos also testified that defendant, as general contractor, was in charge of the means and methods of demolition. N.T. 10/1/15 at 57-59; 10/5/15 at 193. Marinakos testified that being in control of the means and methods of demolition meant that defendant was in control of when, how, and where the building was to be demolished. N.T. 10/1/15 at 57-59. That defendant was in control of the demolition was corroborated by architect John Higgins. N.T. 10/7/15 at 72. Defendant's control of the demolition process was also confirmed by laborers Darryl Alston, Eric Sullivan, and Juan Cajas, who each testified that defendant directed their actions on the site. N.T. 10/5/15 at 211 (Alston); 10/6/15 at 18 (Sullivan); 10/6/15 at 73, 75-76 (Cajas). Sean Benschop testified that he was hired by defendant in order to work on the demolition site with his excavator, where he assisted in the demolition of the buildings on the 2100 and 2200 block of Market Street. N.T. 10/8/15 at 51-52, 55. Benschop testified that defendant instructed him as to what to do with the excavator. N.T. 10/8/15 at 56. Benschop also testified that he would not operate his equipment on the site without defendant being present. N.T. 10/8/15 at 74.

19

It was also clearly established that the manner in which defendant demolished the Hoagie City building was directly contrary to established safety procedures. Albert McCarthy, Code Compliance Specialist for the Department of Licenses and Inspections in Philadelphia, testified that the only way to properly demolish a structure that is adjacent to another occupied structure is from the top down, by hand. N.T. 10/7/15 at 18-19. McCarthy testified that this was in order to prevent the loss of control over the building's demolition. N.T. 10/7/15 at 18-19. Expert structural engineer David Peraza similarly testified that the proper method to demolish a building is from the top down. N.T. 10/9/15 at 21. However, multiple witnesses each testified that defendant did not demolish the Hoagie City building in a top down, by hand manner, but that he instead gutted the building of salvageable material, rendering the building unsafe. In particular, defendant directed his workers to remove the internal support of the Hoagie City building, namely the floors and floor joists. Further, multiple witnesses testified that defendant ordered the mechanical demolition of the building by use of Benschop's excavator.

Eric Sullivan testified that defendant ordered him to remove the floor joists from the buildings next to the Hoagie City building in early May, 2013. N.T. 10/6/15 at 15-18. Sullivan testified that, after removing the joists and demolishing the neighboring buildings, he proceeded to the Hoagie City building and began removing the joists from there as well. N.T. 10/6/15 at 27. Darryl Alston similarly testified that the site was not a normal job site as there were large holes in the middle of the building and joists were missing in the floors. N.T. 10/5/15 at 211-213.

Plato Marinakos testified that, on May 21, 2013, he visited the site and took pictures, which documented that the floor joists of the Hoagie City building had been removed, weakening the lateral support for the building walls. N.T. 10/1/15 (Vol. 1) at 95, 99-100.

20

Marinakos testified that he returned to the work site on June 2, 2013, again took photos, met with defendant, and saw Benshop working on the site with the excavator. N.T. 10/1/15 (Vol. 1) at 104-108; 10/2/15 at 46. Marinakos testified that he was unaware that the floor joists had been removed from the lower floors of the building, and that defendant explained to him that defendant was going to erect scaffolding inside the building to effectuate a hand demolition. N.T. 10/1/15 (Vol. 1) at 106-107; 10/5/15 at 183.

After removing the salvageable floor joists, defendant ordered the removal of the entire front wall of the Hoagie City building. Benschop testified that defendant instructed him to use the excavator and tear down the front of the building on June 2, 2013, and that he did so. N.T. 10/8/15 at 68-73. Marinakos similarly testified that the front wall was removed on June 2, 2013. N.T. 10/2/15 at 46. Additionally, laborer Juan Cajas testified that defendant ordered the removal of the front wall of the Hoagie City building by use of the excavator. N.T. 10/6/15 at 73.

Marinakos testified that visited the work site on June 4, 2013, at approximately 5:00 p.m., and that the western wall of the Hoagie City building was unbraced and free standing. N.T. 10/1/15 (Vol. 1) at 113-119. Benschop testified that the next morning, June 5, 2013, defendant told him to continue to take the eastern wall down as the building owner wanted it down. N.T. 10/8/15 at 82. Benschop testified that he placed a beam in the jaws of the excavator and attempted to take the eastern wall down, but that the western wall collapsed onto the Salvation Army store. N.T. 10/8/15 at 83-87.

The Commonwealth also established defendant's reckless state of mind through the numerous witnesses who had warned defendant that he was proceeding in an improper and highly dangerous manner prior to the collapse. Defendant's employee, Eric Sullivan, testified that he was concerned with the manner in which the Hoagie City building was being demolished

21

as it was leaving free standing walls and that he brought this concern to defendant, who told him to continue removing joists and that defendant would "take care of it." N.T. 10/6/15 at 29-31. Sullivan testified that, after removing more joists from the building, Sullivan again expressed concerns about the building's safety to defendant, who told him to continue working or leave. N.T. 10/6/15 at 32-33. Sullivan testified that his last day on the work site was June 1, 2013. On that day he and defendant had an argument, with defendant ordering Sullivan to continue removing joists. Sullivan refused to do so and quit, since defendant's demolition method would damage the integrity of the walls of the building. N.T. 10/6/15 at 39-40.

Similarly, worker Alston testified that he expressed his concerns to defendant about the safety of the demolition after defendant ordered Benschop to remove the front wall of Hoagie City. N.T. 10/5/15 at 211, 220-221, 250. In addition, Marinakos told defendant the day before the collapse that the wall adjacent to the Thrift Store needed to be taken down that night. N.T. 10/2/15 at 27-28. Cajas, who was one of the workers who defendant sent up to roof of the Thrift Store the night before the collapse, told defendant that the wall was not stable, and that the wall moved while they were working on it. N.T. 10/6/15 at 81-82. Benschop testified that he told the defendant that he was concerned about using the excavator for demolition the day before the collapse since the Thrift Store was occupied, but that defendant ordered him to go forward anyway. N.T. 10/8/15 at 75-76.

Moreover, the evidence demonstrated defendant's consciousness of guilt. When defendant was first interviewed by OSHA investigator Sarah Carle, he falsely told her that the excavator was not being used at the time of the collapse. N.T. 10/7/15 at 286-287. Similarly, Marinakos testified that the morning of the collapse, defendant called him and falsely stated that he had taken the wall down the night before. N.T. 10/2/15 at 36.

22

Accordingly, there was ample evidence from which the jury could conclude that defendant acted with the requisite mental state for first degree aggravated assault, that is, recklessly in a manner manifesting extreme indifference to the value of human life. Defendant pressed forward with a demolition technique well-known to be highly dangerous while a store adjacent to the demolition project was occupied and disregarded clear warnings that the building was unstable and posed an immediate safety hazard. Therefore, defendant's sufficiency of the evidence claim was properly rejected.

*K. Excessive Sentence*

Defendant's next claim reads, in its entirety: "Excessive sentencing by the trial court – 15 to 30 years." Statement of Errors at unnumbered page 6. This claim is without merit.

"Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of that discretion." *Commonwealth v. Anderson*, 552 A.2d 1064, 1072 (Pa. Super. 1988), *appeal denied*, 571 A.2d 379 (Pa. 1989); *see Commonwealth v. Walls*, 926 A.2d 957, 961 (Pa. 2007). The sentencing court must consider the need to protect the public, the gravity of the offense in relation to the impact upon the victim, the rehabilitative needs of the defendant, and the Sentencing Guidelines. 42 Pa.C.S. § 9721 (b); *see Commonwealth v. Hyland*, 875 A.2d 1175, 1184 (Pa. Super. 2005) (quoting *Commonwealth v. Monahan*, 860 A.2d 180, 184 (Pa. Super. 2004)). A sentence within the Guidelines may be vacated only if "the case involves circumstances where the application of the Sentencing Guidelines would be clearly unreasonable." 42 Pa.C.S. § 9781(c)(2).

As to consecutive sentences, "[l]ong standing precedent of [the Superior] Court recognizes that [the Sentencing Code] affords the sentencing court discretion to impose its sentence concurrently or consecutively to other sentences being imposed at the same time or to

23

sentences already imposed." *Commonwealth v. Marts*, 889 A.2d 608, 612-13 (Pa. Super. 2005). Accordingly, the decision to sentence consecutively fails even to raise a substantial question on appeal unless that decision "raises the aggregate sentence to, what appears upon its face to be, an excessive level in light of the criminal conduct at issue in the case." *Commonwealth v. Mastromarino*, 2 A.3d 581, 587 (Pa. Super. 2010) (quoting *Commonwealth v. Gonzalez-Dejusus*, 994 A.2d 595, 596 (Pa. Super. 2010)). Therefore, an appellate court will not disturb consecutive sentences unless the aggregate sentence is "grossly disparate" to the defendant's conduct, or "viscerally appear[s] as patently 'unreasonable.'" *Id.* at 587-588.

Here, in fashioning an appropriate sentence, the Court explicitly considered the evidence presented during defendant's trial and sentencing hearing, the information contained in the pre-sentence report, all the mitigating evidence provided by defendant, the Sentencing Guidelines, the need to protect the public, the gravity of the offense and its impact on the victims, and defendant's rehabilitative needs. N.T. 1/8/16 at 118-123.[9] The Court sentenced defendant on each of the six involuntary manslaughter charges to one to two years incarceration, on each of the eleven REAP charges to six to twelve months incarceration, on the aggravated assault charge to three and a half to seven years incarceration, and on the causing a catastrophe charge to one to two years incarceration. N.T. 1/8/16 at 123-126. The involuntary manslaughter, REAP, and aggravated assault charges were all run consecutive to each other, for an aggregate sentence of 15 to 30 years incarceration, while the causing a catastrophe charge was run concurrently. *Id.*

---

[9] Applying the Seventh Edition of the Sentencing Guidelines, the parties agreed that defendant's prior record score was 1. N.T. 1/8/16 at 14. The parties also agreed that, using the Basic Sentencing Matrix, the charge of causing a catastrophe and six counts of involuntary manslaughter were assigned a standard range of 6 to 14 months, plus or minus 6 months for the aggravated and mitigated ranges, respectively, the 11 counts of REAP were assigned a standard range of RS to 6, plus or minus three months for the aggravated and mitigated ranges, respectively, and the charge of aggravated assault was assigned a standard range of 42 to 60 months, plus or minus 12 months for the aggravated and mitigated ranges, respectively. N.T. 1/8/16 at 18-19.

24

These sentences were all within the standard range of the Sentencing Guidelines and were clearly reasonable.

The magnitude of defendant's criminal behavior established by the record demonstrates that the Court was well within its discretion to run the majority of the sentences consecutively. Defendant presided over, and directed, the demolition of a multi-story building located next to the occupied Salvation Army store. Defendant stripped the building of nearly all lateral support in order to increase his profit margin from salvage. In the course of this demolition, defendant ignored repeated warnings and left an unsupported multistory wall looming over the Salvation Army building. Defendant then continued to demolish the building by ordering the use of an excavator to knock down both the front and eastern walls of the now-gutted building, despite the safety concerns raised by using mechanical demolition. As a result of defendant's actions, the western wall collapsed onto the roof of the Salvation Army Thrift Store, killing six people in a horrible manner and grievously injuring many others. The consecutive sentences reflected the separate victims, and resulted in an aggregate sentence commensurate with the criminal conduct demonstrated during the trial of this case.

Hence, the record demonstrates that the sentence imposed by the Court was not grossly disparate to defendant's conduct or patently unreasonable. *See Mastromarino*, 2 A.3d at 587-588. Accordingly, the sentence should be affirmed on appeal.

*L. Denial of Defense Motions and Objections*

Finally, defendant "incorporates all of the properly filed post trial motions for relief – and the failure of the trial court to properly investigate and grant the requested relief" and submits "all objections noted on the record at all pre [trial] hearings, motions, during the course of the trial and post trial motions for the purposes of the concise Statement of Errors." Statement of

25

Errors at unnumbered pages 6, 7. As the trial in this matter spanned a period of twenty days and included multiple pre-trial and post-trial hearings, the Court is left to guess as to which objections, other than those presented above, defendant now seeks to raise on appeal. Accordingly, this claim is waived. *Cannon*, 954 A.2d at 1228.

### III. CONCLUSION

For all of the foregoing reasons, the Court's judgment of sentence should be affirmed.

BY THE COURT:

GLENN B. BRONSON, J.

Commonwealth v. Griffin Campbell                    CP-51-CR-0001793-2014
Type of Order: 1925(a) Opinion

## PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing Court Order upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa.R.Crim.P.114:

**Defense Counsel/Party:**

William D. Hobson, Esquire
Two Penn Center, Ste. 1410
1500 J.F.K. Blvd.
Philadelphia, PA 19102

Type of Service:        ( ) Personal (X) First Class Mail ( ) Other, please specify:

**District Attorney(s):**

Hugh J. Burns, Jr., Esquire
Chief, Appeals Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107

Type of Service        ( ) Personal (X) First Class Mail ( ) Other, please specify:

**Additional Counsel/Party:**

Joseph D. Seletyn, Esquire
Prothonotary
Office of the Prothonotary – Superior Court
530 Walnut Street, Suite 315
Philadelphia, PA 19106

Type of Service:        ( ) Personal (X) First Class Mail ( ) Other, please specify:

**Dated: March 10, 2017**

Jonathon M. Frisby
Law Clerk to Hon. Glenn B. Bronson